**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **MARTINEZ STATEN,**<br><br>Plaintiff,<br><br>v.<br><br>CITY OF BELLEVILLE, ILLINOIS;<br>OFFICER KRISTEN HOEPFINGER;<br>OFFICER BRENDA DONAT;<br>UNDER THE WOOD PROPERTY, LLC;<br>IESHA UNDERWOOD; and<br>DECARLOS UNDERWOOD, also known as<br>CARLOS UNDERWOOD,<br><br>Defendants. | **Case No. 3:26-cv-01034-GCS**<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT

## INTRODUCTION

1. This civil rights action concerns a police-administered housing-removal process through which the Belleville Police Department ("BPD") sent Plaintiff's landlord a document titled "Eviction Notice" stating that action "must be taken" to remove Plaintiff from his home permanently.

2. The directive was created before the State's Attorney filed any criminal charge and before any eviction case, possession judgment, criminal conviction, or neutral determination that Plaintiff had violated a lease. BPD gave Plaintiff no advance notice, no disclosure of the evidence relied upon, no hearing, no appeal, and no opportunity to contest the police determination before it was delivered to his landlord.

3. Plaintiff had been a named tenant at 2911 Reiss Avenue since 2023. He and his wife renewed the lease together for 2024-2025, lived there with their four children, and treated the property as their family home. The police directive was delivered while Plaintiff held an existing written lease and while the household was renewing for another year.

4. Plaintiff's landlord treated the BPD directive as controlling. Within approximately two hours of telling Plaintiff and his wife that the police required his removal, the landlord reported to Officer Hoepfinger that it had taken immediate action, formally removed Plaintiff from the new lease, and sent an updated lease to the remaining tenant.

5. Plaintiff immediately objected to both BPD and the landlord. He warned that police pressure to remove him without lawful process violated his rights, disputed the allegation and the asserted ordinance violation, and requested that the directive be corrected. BPD did not withdraw the notice, provide a hearing, or identify any procedure through which Plaintiff could obtain review.

6. After Plaintiff directly challenged the directive, filed a formal BPD report concerning Officer Hoepfinger, renewed his complaint in October 2025, and submitted lawful public-records requests in January 2026, BPD resumed contact with the landlord about whether Plaintiff remained associated with the address. Officer Donat later asked the landlord for a disposition concerning Plaintiff's removal.

7. The landlord then demanded that Plaintiff stop living at or accessing his home, issued cure and termination notices expressly tied to police communications, and filed an eviction action. Plaintiff remained, defended the action, and obtained judgment for himself and his wife because the landlord did not meet its burden of proof. The criminal charge was dismissed without a conviction. Neither result withdrew the BPD directive or restored a secure fixed-term tenancy.

8. The notice directed against Plaintiff was not an isolated document. FOIA productions reviewed by Plaintiff contain approximately 310 BPD Crime-Free Housing eviction notices issued during 2024 and 2025, repeated mandatory permanent-removal language, use by multiple officers, a blank template, supervisory approval reflected in BPD records, and repeated communications seeking landlord compliance or disposition information.

9. Plaintiff brings this action for procedural due process violations, municipal liability under Monell, and retaliation for protected complaints, criticism, petitions, and use of public-records procedures in support of those activities. He seeks compensatory damages presently estimated at $2,000,000, punitive damages where legally available, declaratory relief, prospective injunctive reform, and other appropriate relief for his own injuries, including loss of secure tenant status, prolonged housing insecurity, substantial litigation burden, emotional and reputational harm, economic loss to the extent proven, and continuing exposure to the challenged City practice.

## JURISDICTION AND VENUE

10. This action is brought under 42 U.S.C. § 1983 for violations of rights secured by the First and Fourteenth Amendments to the United States Constitution.

11. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 and civil-rights jurisdiction under 28 U.S.C. § 1343(a)(3).

12. This Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 and other appropriate relief under 42 U.S.C. §§ 1983 and 1988.

13. Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to these claims occurred in Belleville, St. Clair County, Illinois, within the Southern District of Illinois, and Defendants reside, work, or conduct business in this District.

## PARTIES

14. Plaintiff Martinez Staten is an Illinois resident who has resided at 2911 Reiss Avenue, Belleville, Illinois 62226 throughout the events described below. He continues to reside at the property and remains subject to the City's Crime-Free Housing Program.

15. Defendant City of Belleville, Illinois ("City") is a municipal corporation responsible for BPD and for the City's Crime-Free Housing Program, forms, practices, training, supervision, review, record systems, and enforcement communications with landlords.

16. Defendant Officer Kristen Hoepfinger was, at all relevant times, a BPD officer acting under color of state law. She created, signed, transmitted, maintained, followed up on, or otherwise enforced Crime-Free Housing communications concerning Plaintiff. She is sued in her individual capacity.

17. Defendant Officer Brenda Donat was, at all relevant times, a BPD officer acting under color of state law. She participated in Crime-Free Housing enforcement communications with Plaintiff's landlord and requested a disposition concerning Plaintiff's removal. She is sued in her individual capacity.

18. Defendant Under The Wood Property, LLC ("Under The Wood") was Plaintiff's landlord or property manager for the property at 2911 Reiss Avenue.

19. Defendant Iesha Underwood was an owner, manager, agent, or representative of Under The Wood. She personally participated in the lease change, communications with Plaintiff and his wife, exclusion demands, notices, and eviction-related actions described below.

20. Defendant DeCarlos Underwood, also known as Carlos Underwood, was an owner, manager, agent, or representative of Under The Wood. He personally participated in the lease change, direct compliance communication with BPD, later enforcement, and eviction-related actions described below. During the relevant period, DeCarlos Underwood also served as a landlord or property-management member of the City-created Crime-Free Housing Committee. Public City agendas identify Carlos Underwood as a Committee member as early as September 30, 2020, throughout the events alleged here, and as recently as July 23, 2026.

21. Plaintiff seeks relief for injuries to himself only. He does not seek to represent his wife, children, or any other person, and he does not seek damages that belong independently to

another member of his household. The related St. Clair County action, Case No. 2026AR000393, asserts separate lease and Illinois Landlord Retaliation Act duties against Under The Wood Property, LLC; it does not assert the federal constitutional, joint-action, Monell, or First Amendment claims pleaded here. Plaintiff seeks only relief attributable to the federal claims in this action and does not seek duplicate compensation for any injury adjudicated or compensated in the state action. To the extent the same indivisible injury overlaps between the two proceedings, it may be compensated only once.

## FACTUAL ALLEGATIONS

### A. Plaintiff's Tenancy and Recognized Housing Interests

22. Plaintiff and his wife live at the property with their four children. The property has served as their family home throughout the events described below.

23. On May 28, 2023, Plaintiff and his wife, Jodi Hillesheim, entered into a written residential lease with Under The Wood for 2911 Reiss Avenue. The lease identified both Plaintiff and his wife as tenants.

24. The original lease also listed Plaintiff, his wife, and the children residing with them as authorized occupants of the property. It stated that the property would be used as a full-time residential dwelling.

25. Plaintiff and his wife obtained the tenancy through the ordinary application and background-check process. Although Iesha Underwood is Plaintiff's relative, the tenancy was not an informal family accommodation.

26. The property is a privately owned residential home paid for through household income. It is not public housing and is not owned or operated by a governmental housing authority.

27. The original lease provided that if the stated term expired and the landlord accepted rent other than past-due rent, a month-to-month tenancy would be created, and the remaining lease terms would continue in effect.

28. The lease separately provided that if the tenants held over with the landlord's consent, the tenancy would continue month-to-month at the existing rental rate and otherwise under the same terms until proper written termination.

29. The lease further provided that modifications had to be in writing and signed by the parties. Plaintiff did not sign any document agreeing that he could be removed from the household tenancy by police directive alone.

30. In May 2024, Under The Wood, Plaintiff, and Plaintiff's wife executed a written renewal for the term beginning June 1, 2024 and ending May 31, 2025. That renewal again identified both spouses as tenants and carried the other terms of the original lease forward.

31. During the 2024-2025 lease term, Plaintiff continued to reside at the property as his family home, paid or contributed to rent, cared for his children there, and remained a recognized tenant. Before the BPD directive, no court had adjudicated that he violated the lease.

32. The household expected to remain at the property after May 31, 2025. Under The Wood prepared a 2025-2026 renewal, but after receiving the BPD directive it presented the renewal with only Plaintiff's wife identified as the named tenant.

33. Under The Wood and Plaintiff's wife signed the renewal dated May 22, 2025. The renewal named Plaintiff's wife as the tenant and did not name Plaintiff as a tenant. It also carried forward the other terms of the original lease except as modified. Plaintiff therefore alleges that he remained an authorized occupant in lawful possession of the family home; he does not allege that the 2025-2026 renewal expressly named him as a fixed-term tenant.

34. During the June 1, 2025 through May 31, 2026 renewal term, Plaintiff continuously remained in possession with his family. Under The Wood accepted rent paid or transmitted by

Plaintiff, including payments for June and July 2025, and continued accepting household rent throughout the term. No court entered a judgment removing Plaintiff from possession.

35. Based on Plaintiff's status as a named tenant through May 31, 2025, the incorporated occupancy terms, continued possession, direct rent payments, rent acceptance, and the parties' course of conduct, Plaintiff retained lawful occupancy and a possessory interest in remaining in his family home unless those interests were ended through lawful process. Plaintiff does not allege that he became a holdover tenant in June 2025.

36. The 2025-2026 fixed term expired on May 31, 2026. Plaintiff alleges that the household entered holdover or month-to-month status beginning June 1, 2026, not before, under the original lease terms and the landlord's continued acceptance of rent.

**B. Belleville's Published Crime-Free Housing Framework**

37. Belleville Code § 154.40 describes the Crime-Free Housing Program as a partnership between the City and owners, landlords, and managing agents intended to address public-safety violations and criminal activity in rental properties.

38. The same section states that the program is not to be construed or enforced in a manner affecting the tenancy of a tenant whose only involvement in an incident was as the victim of a crime.

39. Belleville Code § 154.41 establishes a Crime-Free Housing Committee to evaluate and respond to concerns raised by the public, police, residents, and tenants. The Committee includes landlord, tenant, property-management, and City representatives, and Crime-Free Housing enforcement personnel attend its meetings.

40. Belleville Code § 154.49 requires landlords or managing agents to complete Crime-Free Housing training. The published training subjects include the Crime-Free Housing overview, protected classes, the lease addendum and ordinance, and related enforcement responsibilities.

41. Belleville Code § 154.50 requires a Crime-Free Rental Agreement Addendum. The addendum addresses conduct that would constitute a felony or Class A misdemeanor and identifies circumstances that may constitute good cause for termination of a rental agreement.

42. The City chose to establish the Crime-Free Housing Program by ordinance, require participating landlords to maintain City certificates and complete City-required training, create the Crime-Free Housing Committee, and assign implementation and enforcement functions to City personnel and BPD.

43. Public City materials identify Carlos Underwood as a Committee member from at least September 2020 through July 2026. During the relevant period, he served on that City-created Committee while also acting for Under The Wood concerning Plaintiff's tenancy. BPD therefore used the City's Crime-Free Housing process to demand removal of a tenant from property managed by one of the Committee's landlord members.

44. Plaintiff does not rely on Committee membership alone to establish state action. He alleges it as institutional context together with BPD's mandatory directives, the private Defendants' compliance reports, renewed police-landlord contacts, and coordinated removal efforts described below.

45. The signed addendum states that, unless otherwise provided by law, proof of a violation shall be established by a preponderance of the evidence. It does not state that an arrest, an accusation, an untested police report, or an officer's conclusion automatically satisfies that standard. The signed addendum is attached as Exhibit C.

46. The addendum identifies a lease violation as potential good cause for termination, while Section 154.55 requires a landlord to take prompt, diligent, and lawful steps. Neither provision identifies BPD as an eviction court or expressly authorizes an officer to adjudicate a disputed violation, terminate a private lease, or enter a judgment for possession.

47. Belleville Code § 154.53 authorizes a responding police officer to prepare a Rental Incident Form concerning certain disturbances or criminal activity occurring at or near a rental unit.

48. A Rental Incident Form records police information. It is not itself a judicial finding, an adversarial hearing, a possession order, or a determination that disputed allegations have been proven by a preponderance of the evidence.

49. Belleville Code § 154.55 requires an owner, landlord, or managing agent to take prompt, diligent, and lawful steps in specified circumstances after qualifying notice. The word "lawful" limits the manner in which any housing action may be taken.

50. Section 154.55 also establishes a formal process through which a landlord's Crime-Free Housing certificate may be suspended or revoked. That process involves a hearing officer, notice, the opportunity to present evidence, a recorded hearing, written findings, and a written decision.

51. When a certificate proceeding is based on tenant conduct, the published ordinance provides that the tenant also receives fourteen days' notice and an opportunity to be heard.

52. The published code therefore identifies at least two distinct City tools: a Rental Incident Form is used to report police activity and a formal certificate-enforcement process containing notice and hearing protections.

53. The published code provisions reviewed by Plaintiff do not identify a separate BPD document titled "Eviction Notice" that adjudicates a lease violation, declares an allegation proven, commands permanent removal, or supplies an affected tenant with a procedure to contest or appeal the command.

54. The City's inclusion of notice, a hearing officer, evidence presentation, a recorded hearing, written findings, and review procedures in certificate proceedings demonstrates that the

City knew how to build procedural safeguards into the program. BPD's mandatory-removal notice provided none of those safeguards to the tenant whose housing status it directly targeted.

55. The City's own legislative record shows that procedural safeguards were considered from the program's beginning. Approved January 10, 2013 task-force minutes state that the committee reviewed a section titled "Predeprivation Hearing Opportunity" while completing a revised ordinance draft.

56. Approved January 17, 2013 minutes state that the proposed draft would be distributed to the Mayor, City Attorney, and Chief of Police for their review, requested changes, comments, or suggestions.

57. Approved February 27, 2013 minutes state that the committee chair read portions of a letter from City Attorney Patrick Flynn and that the pre-deprivation-hearing section had been completely deleted. The minutes also state that committee members questioned the deletion and discussed adding the provision back if the City established a City Court.

58. The same February 27 minutes record correspondence from the Shriver Center on Poverty warning that a crime-free housing ordinance could potentially violate a person's rights in domestic-related matters. The minutes therefore document that civil-rights concerns were presented during the City's drafting process.

59. At the September 10, 2013 Ordinance and Legal Review Committee meeting, City Attorney Garrett Hoerner stated that the ordinance did not decide whether a tenant should be evicted, that only a court could make that decision, and that the ordinance required the landlord to begin legal eviction proceedings. An alderman also warned that an officer's arrival did not mean a crime had been committed and objected when the City became involved in the landlord-tenant relationship.

60. At the October 13, 2015 Ordinance and Legal Review Committee meeting, City Attorney Hoerner again stated that municipal crime-free housing was not intended to be the vehicle for eviction and that the landlord still had to proceed through the courts.

61. A City-hosted Public Health and Housing Committee record concerning the later arrest-versus-conviction amendment records Assistant Chief Matt Eiskant explaining that an arrest was distinct from a conviction, that eviction could not occur based on an arrest alone under the Illinois Human Rights Act, and that the ordinance should be amended in response. The committee unanimously approved the proposed change.

62. These official City records are publicly available and support Plaintiff's allegation that before the May 2025 directive the City knew that procedural safeguards, judicial adjudication, officer discretion, and the difference between accusation and conviction presented legal risks. Plaintiff does not allege that the records alone prove a constitutional violation; he alleges that they establish municipal notice and context for the later standardized BPD practice described below.

63. BPD nevertheless developed and repeatedly used a separate mandatory-removal notice. The form combined police incident information with legal conclusions about material and irreparable breach and directed that a named person or all occupants be removed permanently.

**C. The May 2025 BPD Directive Against Plaintiff**

64. On or about May 9, 2025, BPD arrested Plaintiff following a disputed domestic-battery allegation. Plaintiff denied the allegation. At that time, no court had found that Plaintiff committed a crime or violated the lease.

65. Plaintiff does not challenge the City's authority to investigate reported conduct, create accurate incident records, or communicate neutral information to a landlord. Nor does he claim that a landlord may never seek possession through court. He challenges BPD's separate use of

police authority to treat a disputed allegation as a proven lease violation and direct permanent removal before any neutral hearing or judicial determination.

66. On May 12, 2025, Officer Hoepfinger created, signed, or caused the creation of a BPD case document identified in BPD records as an 'EVICTION NOTICE.' The criminal docket shows that the State's Attorney filed the related charge on May 14, 2025, two days after the notice was created. Plaintiff did not learn that the charge had been filed until approximately July 2025. The BPD notice is attached as Exhibit A.

67. The notice quoted portions of the Crime-Free Housing addendum and characterized the alleged lease violation as material and irreparable.

68. The notice stated in substance that the alleged violation justified immediate termination of the rental agreement and recovery of possession of the premises.

69. The notice then commanded: "Action must be taken to remove Martinez Staten from the property permanently."

70. The notice attached or relied upon a Rental Incident Form that described the disputed allegation as an event without explaining that Plaintiff denied it or that no neutral factfinder had resolved the conflicting accounts.

71. The BPD case record identified Officer Angelina Frantz as a reporting officer and Sergeant Aaron Spargur as an approving officer. The approval entry supports Plaintiff's allegation that the directive passed through BPD's ordinary reporting and supervisory workflow.

72. The notice did not tell the landlord merely that police had responded to an incident. It used mandatory language and supplied a specific required outcome: Plaintiff's permanent removal from the property.

73. The notice gave Plaintiff no advance notice, no disclosure of supporting materials, no opportunity to submit contrary evidence, no hearing, no neutral decision-maker, no written findings produced after an adversarial process, and no appeal or correction procedure.

74. On May 20, 2025, Officer Hoepfinger emailed the notice to Under The Wood. On May 21, 2025, BPD also sent or caused certified-mail delivery of the notice to the landlord, reinforcing the formal and mandatory character of the communication.

75. Officer Hoepfinger did not post the notice or any note on a door at 2911 Reiss Avenue. The challenged notice was transmitted to the landlord by email and certified mail; it was not personally posted at Plaintiff's residence.

**D. Immediate Lease Change and Compliance Reporting**

76. On May 22, 2025, at approximately 10:52 a.m., Iesha Underwood emailed Plaintiff's wife and copied Plaintiff. The email stated that Under The Wood had received formal notification from BPD through the Crime-Free Housing process.

77. Iesha Underwood told the household that Under The Wood was required to remove Plaintiff from the lease and that the renewal would be solely in Plaintiff's wife's name.

78. At approximately 10:57 a.m., Iesha Underwood sent a follow-up message forwarding the BPD "Eviction Notice" to Plaintiff and his wife.

79. At approximately 12:42 p.m., DeCarlos Underwood emailed Officer Hoepfinger. He stated that Under The Wood had taken immediate action to comply with the directive, informed both tenants, removed Plaintiff's name from the new renewal, and sent an updated renewal to Plaintiff's wife. The May 22, 2025 landlord communication transmitting the BPD notice and describing the required lease change is attached as Exhibit B.

80. The compliance email was not a private internal landlord decision. It was a direct report back to the police officer who transmitted the directive, confirming that the requested housing action had been carried out.

81. Under The Wood prepared the 2025-2026 renewal dated May 22, 2025 in the name of Plaintiff's wife alone. Although the renewal carried forward the original lease terms, the landlord

treated Plaintiff as removed from the tenant designation he had held during the prior two lease years.

82. Plaintiff did not sign that renewal, did not agree that the police notice had terminated his rights, and did not voluntarily surrender possession of his home.

83. At approximately 4:13 p.m. on May 22, Plaintiff emailed Officer Hoepfinger. He challenged the directive, explained that pressuring his landlord to remove him without lawful process could violate his rights, and requested that the matter be addressed and corrected.

84. At approximately 4:37 p.m., Plaintiff separately emailed Iesha Underwood. He disputed the allegation and alleged ordinance violation, warned the landlord not to rely on police pressure without lawful grounds, and asked the landlord to obtain clarification from Officer Hoepfinger.

85. At approximately 8:11 p.m., Iesha Underwood responded that Under The Wood's actions were based on formal written law-enforcement notice, that the directive contained clear instructions, and that excluding Plaintiff was not personal or discretionary.

86. The landlord's statement confirmed that the BPD directive was the stated reason for the lease change and that the landlord understood the City's communication as removing its discretion to leave Plaintiff on the renewal.

87. On June 2, 2025, at approximately 8:41 a.m., Plaintiff sent Officer Hoepfinger a second follow-up email. He described the BPD communication as a false eviction suggestion that had been sent to his landlord and again sought follow-up from the officer responsible for the directive.

88. BPD did not withdraw the notice, hold a hearing, provide an appeal, identify the evidence relied upon, or issue a written response explaining why Plaintiff's objection was rejected.

### E. Widespread Notice Practice, Standardization, and City Notice

89. Plaintiff's notice was not an isolated event. Based on BPD FOIA productions reviewed to date, BPD issued approximately 310 Crime-Free Housing eviction notices during 2024 and 2025.

90. The reviewed records include approximately 168 notices issued in 2024 and approximately 142 notices issued in 2025.

91. Many notices used the same or substantially similar mandatory language, including "remove from property permanently" and "Action must be taken to remove from the property permanently."

92. Approximately fifty reviewed notices directed removal of all occupants from a rental property rather than merely identifying one individual.

93. The reviewed records identify approximately 129 unique landlords or landlord entries that received BPD Crime-Free Housing notices during the two-year period.

94. The notices were associated with Rental Incident Forms and BPD report numbers, supporting the inference that BPD operated a repeatable pipeline from police incident reporting to mandatory housing-removal communication.

95. The reviewed records identify Officer Hoepfinger on numerous notices, including Plaintiff's notice, and identify Officer Donat on numerous notices as well.

96. On December 17, 2024, before the notice involving Plaintiff, Officer Donat created or caused the creation of another BPD document identified as an "EVICTION NOTICE" and addressed to Under The Wood Property LLC concerning another tenant or occupant. The BPD form used the same mandatory-removal language, including that action had to be taken to remove the identified person from the property permanently. On information and belief, BPD transmitted the notice to Under The Wood by email, postal mail, or both; the precise transmission records are within Defendants' possession or control.

97. On its face, the December 2024 notice did not identify advance notice to the affected occupant, a BPD hearing, neutral review, an appeal, a correction procedure, or a judicial order required before the demanded removal. The notice gave Under The Wood direct experience with BPD's standardized form, mandatory language, and compliance expectations before the May 2025 directive involving Plaintiff. Plaintiff relies on the prior notice only to show the City's repeated practice and the private Defendants' prior familiarity with the workflow; he does not seek relief for the other person or allege the outcome of that person's housing matter.

98. The 2025 FOIA production included a blank or template-style notice containing the sentence, "Action must be taken to remove _________________ from the property permanently," together with blank signature or contact fields.

99. The existence of a blank template supports the allegation that BPD did not independently draft unique language for each incident but used a standardized removal form as part of an established Crime-Free Housing workflow.

100. The volume, uniform wording, template, use by multiple officers, supervisory approval reflected in BPD records, and direct compliance communications support the inference that the practice was widespread, settled, and known within the City. The notices reviewed by Plaintiff do not provide affected tenants with notice of a BPD hearing, an appeal, or a correction procedure.

101. The FOIA production available to Plaintiff does not establish how many notices resulted in eviction cases, how many tenants left without litigation, how many notices were withdrawn or corrected, or whether BPD tracked the outcome of each directive. Those City-controlled facts are appropriate subjects for discovery.

102. On October 29, 2025, Plaintiff sent Officer Hoepfinger a third written follow-up concerning what he described as the unlawful eviction notice. Officer Hoepfinger forwarded the

communication internally to Master Sergeant Samuel Parsons, a BPD supervisor associated with the Crime-Free Housing chain.

103. Plaintiff is not aware of any investigation, tenant hearing, correction, withdrawal, legal review, or written response following that internal supervisory escalation.

104. Plaintiff's direct May 2025 objection, formal September 2025 BPD report, October 2025 follow-up and supervisory escalation, and continued challenges placed the City on actual notice that its form was being understood and used as a mandatory permanent-removal command without tenant process.

105. Despite that notice, the City left the directive active, failed to establish a tenant-facing review process, and permitted officers to continue monitoring and seeking landlord compliance concerning Plaintiff.

**F. Protected Activity and Renewed Police-Landlord Enforcement**

106. Plaintiff's objections to police-directed removal, criticism of BPD conduct, formal police report, requests for correction, and petitions to City personnel were protected First Amendment activity. Plaintiff submitted the January public-records requests as part of his continuing effort to investigate BPD conduct and seek personal records. He does not premise this claim on a freestanding constitutional entitlement to obtain government records.

107. Officer Hoepfinger had direct knowledge of Plaintiff's protected activity because Plaintiff emailed her on May 22, 2025 and expressly challenged the legality of the housing-removal pressure.

108. The private Defendants had direct knowledge because Plaintiff separately emailed the landlord the same day, disputed the City's asserted basis, and asked Under The Wood not to rely on the police directive without clarification.

109. On September 27, 2025, Plaintiff used BPD's online police-report form to report harassing communications by Officer Hoepfinger relating to the Crime-Free Housing notice. He

attached the notice and stated that it had been sent to his landlord without a judicial eviction order or a criminal conviction. BPD assigned report number 25-5068 and confirmed it on September 29, 2025.

110. Plaintiff continued seeking correction in October 2025. On October 29 he directly emailed Officer Hoepfinger for a third time. She forwarded the challenge into BPD's supervisory Crime-Free Housing chain rather than withdrawing the notice or providing a hearing.

111. On the records presently available to Plaintiff, BPD did not request a removal disposition from the landlord or document a new Crime-Free Housing basis concerning Plaintiff between the May 2025 compliance exchange and Officer Hoepfinger's renewed January 23, 2026 contact.

112. On January 18, 2026, Plaintiff submitted BPD public-records Request 26-119 through the City's NextRequest portal. The request sought records concerning a November 14, 2025 traffic stop, including reports, dispatch records, video, warning records, and warrant-related records. The portal listed 2911 Reiss Avenue as Plaintiff's requester address and showed that BPD opened the request at 4:03 p.m.

113. Five days later, on January 23, 2026, Officer Hoepfinger emailed Under The Wood and requested an update because documented contact showed Plaintiff still listing 2911 Reiss Avenue as his address.

114. On January 29, 2026, Plaintiff submitted BPD public-records Request 26-207 seeking records concerning BPD's response to the January 19, 2026 death of his stepson, including reports, dispatch records, and body-camera materials. Plaintiff withdrew that request on February 2, 2026 after determining that he no longer needed the requested records. Neither January request concerned the Crime-Free Housing Program.

115. The January 23 email did not identify a new incident, adjudication, lease violation, or court order. It returned to the same unresolved question of whether Plaintiff had been removed pursuant to the May 2025 directive.

116. Plaintiff does not presently know which City or BPD record supplied the address information referenced in Hoepfinger's email. The source may have been Request 26-119, the underlying November 2025 traffic-stop record, another protected complaint, or a related BPD record system. Regardless of the precise source, Hoepfinger used the address information to renew enforcement of the same directive after Plaintiff had repeatedly criticized it, formally reported her conduct, and requested correction.

117. The exact source of the information, the officers who reviewed it, and the internal communications leading to renewed landlord contact are within Defendants' control and require discovery.

118. On February 9, 2026, Under The Wood told Plaintiff's wife that BPD had contacted the landlord due to Plaintiff's "multiple recent interactions" with BPD and because he continued to list the property as his address. BPD did not tell the landlord that the recent interactions included lawful public-records requests. The landlord was not initially aware of that fact.

119. Under The Wood demanded that Plaintiff no longer live at the property, use the property, or access it in any capacity, even though Plaintiff remained in possession and no court had entered a judgment removing him.

120. On February 9, Plaintiff emailed DeCarlos Underwood and asked Under The Wood not to take adverse action based solely on police pressure without lawful process. Plaintiff explained that his recent BPD interactions were lawful public-records requests, that the criminal matter remained contested, and that no court had ordered his removal.

121. Plaintiff's wife independently asked Under The Wood to hold lease-enforcement action until the then-upcoming February 17 court date so the legal process could conclude, and Plaintiff could seek to clear his name and be restored to the lease.

122. On February 10, 2026, at approximately 9:13 a.m., Officer Donat emailed Under The Wood. She referred to a recent conversation concerning Plaintiff's removal, asked whether contact with the leaseholder had occurred, stated that Plaintiff still reported the property as his address as of January 2026, and requested a disposition.

123. Officer Donat's use of the term "disposition" sought confirmation of what action the landlord had taken in response to the City's removal process.

124. At approximately 9:16 a.m., Under The Wood refused to pause lease enforcement, stating that pending court proceedings and possible future changes did not alter its present position.

125. At approximately 12:37 p.m., Under The Wood responded directly to Officer Donat that contact had been made with the leaseholder, written notice had been provided, and the matter was proceeding through the landlord-tenant process.

126. The February 10 exchange created a second direct feedback loop: BPD requested a removal disposition, and the landlord reported that formal notice and landlord-tenant proceedings were underway.

127. No new incident, proven misconduct, adverse adjudication, or court order occurred between Plaintiff's protected complaints and records activity and the renewed police-landlord enforcement. The renewed actions remained tied to the May 2025 directive that Plaintiff had repeatedly challenged.

128. On February 11, 2026, Plaintiff submitted an online crime tip to BPD reporting that Officers Donat and Hoepfinger were repeatedly making unwanted communications to his landlord and interfering with his private housing agreement by pressuring the landlord to remove

him permanently. Plaintiff selected the Crime Tip channel because BPD's webpage represented that harassment could be reported through that channel. He used the term descriptively for the repeated unwanted communications and pressure; he did not allege that the officers had committed a particular criminal harassment offense or treat the Crime Tip submission as the same procedure as a formal citizen complaint.

129. On February 18, 2026, Plaintiff emailed BPD's Online Reports address and Captain Thomas Keilbach, attached a copy of his February 11 submission, and requested confirmation, a case number, and prompt supervisory review. Captain Robert Thomason replied that the submission was a crime tip rather than an online police report, that crime tips do not generate report numbers, and that Plaintiff appeared to be attempting to make a citizen complaint against a BPD officer and another employee. Thomason invited Plaintiff to provide the complaint by form or email. Plaintiff replied the same day that BPD's webpage listed harassment as a reason to use the Crime Tip channel and that he had intentionally used that channel to report repeated, unwanted police communications to his landlord that were threatening his tenancy. This exchange placed BPD command-level personnel on actual notice before the landlord's February 23 termination notice and March eviction filing. BPD did not inform Plaintiff that the directive had been withdrawn or corrected before those actions occurred.

## G. Cure Notice, Termination, Eviction, and Continuing Effects

130. On February 10, 2026, Iesha Underwood issued a ten-day cure-or-vacate notice to Plaintiff's wife. The notice characterized Plaintiff as an unauthorized occupant and relied expressly on law-enforcement contact.

131. The cure notice demanded that Plaintiff cease residing at or accessing the premises in any capacity and threatened lease termination if the household did not comply.

132. On February 23, 2026, Under The Wood issued a ten-day termination notice to Plaintiff and his wife. The notice quoted BPD's permanent-removal directive, referred to

continuing law-enforcement communications, purported to terminate the household's existing 2025-2026 tenancy before any judicial determination, and demanded surrender of the property. On February 25, 2026, Under The Wood forwarded Plaintiff's February 9 email and its attached legal materials to Officer Hoepfinger. The forwarded email contained Plaintiff's express objections to police pressure, his assertion that no court had ordered his removal, and his request that the landlord take no adverse action without lawful process. Under The Wood asked Hoepfinger about the outcome of Plaintiff's February 17 criminal court date and stated that the matter had been turned over to its attorney for eviction.

133. On March 2, 2026, Plaintiff's wife, Jodi Hillesheim, sent a written complaint to City Health, Housing, and Building personnel, including Director Scott Tyler. She requested City review of the landlord's use of the Crime-Free Housing process, the attempted change in Plaintiff's tenancy without a hearing, the timing of the landlord's action, fair-housing concerns affecting their interracial household with minor children, and a potential conflict arising from the landlord's role on the City's Crime-Free Housing Committee.

134. After receiving no response, Hillesheim followed up on March 10, 2026. Tyler responded that he had forwarded the entire matter to BPD's Code Enforcement Division because all Crime-Free Housing issues were handled through that division. He stated that he was unfamiliar with the situation and would ask BPD how it should be handled.

135. The March 2 complaint and March 10 forwarding gave the City additional written notice of the disputed tenant-removal process before the landlord filed the eviction action. Plaintiff does not yet know whether, when, or how BPD communicated the complaint or its substance to the private Defendants; those communications are within Defendants' possession or control.

136. On March 12, 2026, Under The Wood filed an eviction action against Plaintiff, his wife, and unknown occupants. The complaint relied on the Crime-Free Housing issue, the May 2025 allegations, and the wife-only renewal produced after the BPD directive.

137. On March 16, 2026, after consulting the City Attorney, Tyler told Hillesheim that the ordinance's appeal process applied to owners, landlords, and managing agents, but that the Crime-Free Housing Ordinance provided no process for a tenant to request an appeal. Hillesheim replied that the absence of a tenant review mechanism left eviction court as the tenant's first opportunity to be heard and raised due-process, fair-housing, and delayed-enforcement concerns.

138. The City did not provide an independent tenant review, withdraw the BPD directive, or identify a City procedure through which Plaintiff could contest the continuing police-created removal demand. Tyler instead referred the household to a legal-aid organization.

139. Plaintiff did not voluntarily leave. He remained in the family home, appeared in court, challenged the asserted default, and required Under The Wood to prove its entitlement to possession.

140. On March 17, 2026, the circuit court dismissed the criminal case without a conviction or adjudication that Plaintiff committed the alleged conduct. The written order states that dismissal was entered on the State's motion pursuant to communication with the alleged victim, and the docket identifies the disposition as dismissal by court action.

141. At the March 30, 2026 first appearance in the eviction case, Plaintiff told counsel representing Under The Wood that the criminal case had been dismissed. Plaintiff's wife was present for that conversation. Under The Wood nevertheless continued seeking possession through trial.

142. On May 6, 2026, the eviction court entered judgment for Plaintiff and his wife and denied Under The Wood possession because the landlord did not meet its burden of proof. The written order also noted that the related criminal charge had been dismissed.

143. The eviction judgment confirmed that the landlord had not established a present right to remove Plaintiff and his household through the possession action. It did not rescind the BPD directive, correct the City record, compensate Plaintiff's losses, or undo the prior lease change, unauthorized-occupant designation, termination notice, and public eviction filing.

144. On May 13, 2026, after the eviction judgment, Plaintiff and his wife asked Under The Wood whether it would renew or continue their tenancy when the current term expired on May 31. Under The Wood replied that the lease would automatically become month-to-month upon expiration with the same terms and conditions. Plaintiff and his wife requested a new twelve-month lease for family stability.

145. On May 21, 2026, Iesha Underwood declined the requested twelve-month renewal and stated that Under The Wood's standard practice was to transition tenants who had occupied a property for two years or more to month-to-month tenancy. A proposed month-to-month agreement was later presented, Plaintiff and his wife made a counterproposal, and Under The Wood declined it. No new agreement was executed.

146. In a June 2026 email exchange, Iesha Underwood stated in substance that the guidance given to the landlord had been based on Plaintiff's arrest, that she understood the guidance to require compliance and remove landlord discretion, and that police later contacted the landlord again.

147. Those later explanations were consistent with the May 22, 2025 statement that Plaintiff's exclusion was not discretionary and with the direct reports of compliance and disposition sent to BPD.

148. Plaintiff prevailed in eviction court because he remained and required the landlord to prove its claimed right to possession. That success did not erase the prior lease change, unauthorized-occupant label, exclusion demands, termination notice, public eviction filing, litigation burden, or continuing existence of the BPD directive.

### H. State Action and Joint Participation

149. Officers Hoepfinger and Donat acted under color of state law by using their BPD positions, City forms, police records, supervisory channels, and Crime-Free Housing communications to affect Plaintiff's tenancy.

150. The private Defendants did not merely receive neutral police information and make an unrelated private decision. BPD delivered a formal command backed by the City's certificate-enforcement framework, and the private Defendants implemented the precise removal outcome demanded by police while repeatedly reporting their compliance and enforcement progress back to BPD.

151. The private Defendants changed the renewal immediately after receiving the notice, told the household that compliance was required, and reported to Officer Hoepfinger that Plaintiff had been formally removed from the new lease.

152. When Plaintiff challenged the directive, the private Defendants did not conduct or disclose an independent factual investigation. They continued to rely on the police determination unless BPD clarified or withdrew it.

153. BPD later monitored whether Plaintiff remained associated with the address. Under The Wood then demanded his exclusion and represented to the household that renewed police contact had brought the issue back to the landlord's attention.

154. Officer Donat referred to a recent removal conversation and requested a disposition. Under The Wood responded that written notice had been issued and landlord-tenant proceedings were underway.

155. The reciprocal sequence was continuous: BPD issued the directive; the landlord reported compliance; Plaintiff objected; BPD retained and monitored the directive; the landlord demanded exclusion; BPD requested a disposition; the landlord reported that formal enforcement was underway; and, on February 25, the landlord forwarded Plaintiff's protected objection and

supporting materials back to Officer Hoepfinger while reporting that the matter had been referred to counsel for eviction.

156. DeCarlos Underwood's Crime-Free Housing Committee role, Under The Wood's prior receipt of a similar Donat notice, and his immediate compliance report to Hoepfinger support the inference that the private Defendants were familiar with the City process and knowingly participated in it.

157. Iesha Underwood's repeated statements that the landlord lacked discretion and was acting because of formal police guidance further support the allegation that the private enforcement was intertwined with and driven by the City process.

158. Plaintiff alleges that the private Defendants' challenged conduct is fairly attributable to the City because the City significantly encouraged or coerced the specified removal action and because the private Defendants knowingly and willfully participated in the continuing police-directed enforcement process.

159. The private Defendants' repeated position that the City left them no discretion further supports Plaintiff's allegation that the specified housing action was compelled or significantly encouraged by the City rather than produced by independent private judgment.

**I. Injury to Plaintiff**

160. Defendants' conduct removed Plaintiff's name from the renewal during the 2025 renewal process, caused the landlord to treat him as no longer recognized as a tenant, resulted in an unauthorized-occupant label, and placed his continued residence with his wife and children under threat.

161. The loss of status was not theoretical. The landlord demanded that Plaintiff stop living at or accessing his home, issued cure and termination notices, and filed a possession action seeking to remove the household.

162. From May 22, 2025 through the May 6, 2026 eviction judgment, Plaintiff experienced recurring fear and uncertainty about whether he or his family would lose their home based on an unreviewed police directive.

163. Plaintiff remained in the home only by repeatedly challenging BPD and the landlord, researching the governing rules, gathering records, preparing filings, attending court, and defending the eviction action.

164. Plaintiff incurred filing fees, postage, printing, copying, transportation, and other case-related expenses. He presently estimates those direct expenses at approximately $400, subject to itemization and proof.

165. Plaintiff experienced persistent stress, anxiety, fear, anger, embarrassment, and difficulty concentrating. The stress was present on most days and intensified when the landlord resumed enforcement, issued notices, filed the eviction action, and proceeded to trial.

166. Plaintiff was pursuing graduate education during part of this period. The overlapping housing, records, court, employment, and family demands interfered with his concentration and ability to devote normal attention to schoolwork.

167. The BPD Rental Incident Form and permanent-removal notice presented a disputed allegation as though serious misconduct had been established. Plaintiff suffered humiliation and reputational harm from being portrayed to his landlord as a person who should be permanently removed from his home.

168. Plaintiff and his wife care for four children without regular outside childcare assistance. The threatened loss of the family home added substantial instability to already demanding parenting, school, work, and transportation responsibilities.

169. Plaintiff's sleep was already constrained by work and childcare responsibilities. The legal research, document preparation, court appearances, and continuing fear of housing loss substantially worsened his sleep and exhaustion.

170. Defending the eviction action disrupted Plaintiff's work and family schedule and materially contributed to schedule disruption, exhaustion, and attendance difficulties. Amazon terminated his employment on April 7, 2026. Plaintiff later returned to employment at the same facility, making the job loss temporary but leaving lost wages and employment benefits. Plaintiff does not allege that Defendants directed Amazon or controlled its termination decision, and he seeks those losses only to the extent admissible evidence establishes proximate causation.

171. Plaintiff also suffered a loss of trust in BPD and the City's complaint and records processes. His direct objections did not produce a hearing or correction, and renewed housing enforcement followed his continuing criticism, formal report, petitions, and related efforts to obtain information.

172. Although Plaintiff continued to complain and seek information, the experience caused him to fear that further criticism, complaints, petitions, or use of City records procedures in support of those petitions could again be used to monitor his address or trigger adverse landlord contact.

173. The challenged conduct would deter a person of ordinary firmness from criticizing police conduct, filing complaints, petitioning City officials, or using public-records procedures in support of efforts to investigate and challenge governmental conduct.

174. Plaintiff and his family remain at 2911 Reiss Avenue. Since June 1, 2026, the household has continued in holdover or month-to-month status under the continuing lease terms and rent acceptance. Plaintiff remains subject to the City's active Crime-Free Housing Program, and the original BPD directive remains in City records without being withdrawn, rescinded, corrected, or clearly marked inactive.

175. BPD previously resumed enforcement after months of inactivity and used address information to monitor whether Plaintiff remained associated with the property. Because Plaintiff remains at the same address, the landlord remains subject to the same City program, and the

directive remains active or uncorrected, Plaintiff faces a continuing risk that the directive or the same workflow will again be used against his occupancy.

176. Plaintiff's success in eviction court reduced the immediate risk of physical removal but did not restore a secure fixed-term tenancy, erase the eviction filing and prior notices, compensate his losses, or eliminate the continuing threat created by the uncorrected City record.

## CLAIMS FOR RELIEF

### COUNT I
### FOURTEENTH AMENDMENT - PROCEDURAL DUE PROCESS
### Against Hoepfinger, Donat, Under The Wood, Iesha Underwood, and DeCarlos Underwood

177. Plaintiff incorporates paragraphs 1 through 81 and 94 through 176 to the extent relevant to this Count.

178. The Fourteenth Amendment prohibits state actors from depriving a person of protected property interests without constitutionally adequate process.

179. Plaintiff possessed protected interests in his then-existing written lease, his recognized tenant and occupancy status through May 31, 2025, his lawful possession and use of the family home, and his continuing authorized occupancy and possessory interests supported by the incorporated lease terms, continued possession, rent payments, and rent acceptance.

180. Those interests were concrete and existing. Plaintiff was a named tenant in possession under the 2024-2025 fixed-term lease when BPD created and transmitted the directive. He was not merely applying to the City for a new housing benefit.

181. Officer Hoepfinger used governmental authority to create, transmit, maintain, and follow up on a mandatory permanent-removal directive that treated an unresolved allegation as a proven housing violation.

182. The directive caused immediate and concrete changes in Plaintiff's housing status: the landlord removed his name from the 2025-2026 renewal and reported that removal to BPD as

compliance. The continuing police-directed process later resulted in an unauthorized-occupant designation, demands that he cease residing at or accessing the home, and a notice purporting to terminate the household's existing tenancy.

183. Officer Donat later reinforced and continued the deprivation by participating in removal-related communications, requesting a disposition, and using the City's Crime-Free Housing process to press for enforcement while the allegation remained disputed and unadjudicated.

184. Under The Wood, Iesha Underwood, and DeCarlos Underwood participated in that deprivation by implementing the police command, altering the renewal, reporting compliance, demanding exclusion, serving cure and termination notices, and pursuing possession through the continuing police-directed process.

185. Before the City transmitted its permanent-removal determination, Defendants provided Plaintiff no notice, evidence disclosure, opportunity to submit contrary information, hearing, neutral review, or written decision following an adversarial process.

186. After Plaintiff objected, Defendants provided no prompt post-deprivation process capable of withdrawing or correcting the BPD directive, restoring his status, or preventing renewed enforcement.

187. The later criminal and eviction proceedings did not supply the missing process for BPD's determination. The criminal case addressed criminal liability, and the eviction case addressed the landlord's right to possession. Neither required the City to justify the factual and legal basis of its directive or provided a procedure to withdraw, correct, or appeal the BPD record.

188. The deprivation arose from an established and foreseeable City workflow rather than a random, unauthorized act. Notice and neutral review were practicable before BPD transmitted a command carrying the predictable consequence of changing or terminating a private tenancy.

189. At the time of the challenged conduct, a reasonable officer would have understood that police authority could not be used to alter or terminate an existing private tenancy through an unreviewed permanent-removal command, particularly where the published ordinance did not authorize BPD to adjudicate lease violations or enter judgments for possession.

190. The foregoing conduct deprived Plaintiff of protected occupancy and possessory interests without constitutionally adequate process and caused the injuries described above. Plaintiff does not premise this claim solely on physical dispossession, on being expressly named in the 2025-2026 renewal, or on an entitlement to a future renewal.

**COUNT II**
**MUNICIPAL LIABILITY UNDER MONELL - PROCEDURAL DUE PROCESS**
**Against the City of Belleville**

191. Plaintiff incorporates paragraphs 1 through 105 and 111 through 190 to the extent relevant to this Count.

192. A municipality is liable under 42 U.S.C. Section 1983 when its official policy, widespread custom, established practice, standard form or workflow, or deliberately indifferent failure to train or supervise is the moving force behind a constitutional deprivation.

193. The challenged municipal practice is not merely the published Crime-Free Housing ordinance. It is BPD's additional standardized practice of converting incident information into police-issued mandatory-removal directives that the ordinance does not identify and that contain no tenant-facing notice, hearing, review, or correction procedure.

194. The City's enactment of the published program and BPD's repeated use of the additional notice workflow are related but distinct municipal choices. Plaintiff alleges that the mandatory-removal form and compliance-monitoring workflow were unconstitutional as applied to him even if other portions of the published ordinance may be administered lawfully.

195. The City's approved meeting records independently support municipal notice. They show that City officials considered and deleted a pre-deprivation-hearing provision, received

civil-rights concerns during drafting, publicly recognized that only a court decides eviction and that crime-free housing was not itself the vehicle for eviction, and later addressed the legal difference between arrest and conviction.

196. Despite that notice, BPD adopted and repeatedly used a police document labeled "Eviction Notice" that declared an immediate, permanent-removal outcome without tenant notice, neutral review, judicial findings, or a conviction. That contrast supports Plaintiff's allegations of deliberate municipal choice, inadequate training and supervision, and deliberate indifference to the predictable deprivation.

197. The City's March 2026 response further reflected the same allocation of authority. The Health, Housing, and Building Director routed a tenant's written procedural complaint back to BPD Code Enforcement, and, after consulting the City Attorney, confirmed that the ordinance supplied no tenant-initiated appeal. Those facts support the allegation that the absence of tenant review was structural rather than an isolated omission by one officer.

198. The practice is evidenced by approximately 310 notices in two years, repeated permanent-removal language, approximately fifty whole-property removal notices, approximately 129 landlord entries, and use by multiple BPD officers, including Officer Donat's December 2024 use of the same workflow with Under The Wood before the directive involving Plaintiff. The other notices are pleaded to show a City practice or custom; Plaintiff does not seek damages for other tenants and need not establish at pleading that every notice ended in a completed eviction.

199. The blank template containing the command to remove an unidentified person permanently is direct evidence that the City maintained a standardized form rather than relying on isolated, officer-specific wording.

200. The association of notices with Rental Incident Forms and report numbers shows an operational pipeline through which police incident records were converted into housing-removal directives.

201. Supervisory approval reflected in BPD records and the internal forwarding of Plaintiff's challenge to a Crime-Free Housing supervisor supports the allegation that the practice was known within the department and not merely a rogue act.

202. The City failed to distinguish through adequate policy and training between reporting an allegation, proving a lease violation by a preponderance of the evidence, requiring a landlord to take lawful steps, adjudicating a private tenancy, and obtaining a judicial judgment for possession.

203. The City failed to require tenant notice, an opportunity to respond, neutral review, evidence disclosure, written findings, legal review, or an effective correction procedure before or promptly after officers transmitted mandatory-removal commands.

204. The obvious consequence of the City's form and workflow was that landlords would treat a formal BPD "Eviction Notice" as a binding governmental directive and alter or terminate tenancies without an independent hearing.

205. The risk was not hypothetical. Under The Wood expressly told Plaintiff that compliance was required and not discretionary, and it reported immediate compliance directly to BPD.

206. The volume and uniformity of the notices, the use of a template, the involvement of multiple officers and supervisors, the prior notice to the same landlord, and the direct compliance feedback were sufficient to place the City on actual or constructive notice of the constitutional risk.

207. Plaintiff additionally gave the City actual notice through his May 2025 objection, September 2025 formal police report, October 2025 supervisory escalation, January 2026 public-

records activity, February 11 crime tip, and February 18 request for prompt supervisory review. Captain Thomason's February 18 response expressly recognized that Plaintiff was attempting to complain about BPD personnel. The City did not withdraw the notice or create a meaningful tenant review process.

208. The City's policy, custom, practice, standard workflow, deliberate failure to train or supervise, and failure to correct were the moving force behind the deprivation of Plaintiff's Fourteenth Amendment rights and the resulting injuries.

**COUNT III**
**FIRST AMENDMENT RETALIATION**
**Against Hoepfinger, Donat, Under The Wood, Iesha Underwood, and DeCarlos Underwood**

209. Plaintiff incorporates paragraphs 1 through 21, 61 through 81, and 94 through 176 to the extent relevant to this Count.

210. The First Amendment protects a person from governmental retaliation for criticizing police conduct, petitioning officials for redress, submitting complaints, and seeking information as part of an effort to investigate and challenge governmental conduct.

211. Plaintiff engaged in protected activity by directly challenging Officer Hoepfinger's directive on May 22, 2025; warning BPD and the landlord that police-directed removal violated his rights; requesting correction; filing BPD report 25-5068 on September 27, 2025; emailing Hoepfinger again on October 29, 2025; using the public-records process as part of his continuing effort to investigate BPD conduct and seek redress; objecting to renewed police-landlord interference; and submitting a February 11, 2026 crime tip concerning that interference; and following up with BPD command personnel on February 18, 2026, while reiterating that the officers' unwanted landlord communications threatened his tenancy.

212. Officer Hoepfinger had actual knowledge of Plaintiff's protected objections because he directly emailed her on May 22 and October 29, 2025, formally reported her conduct to BPD

in September 2025, and had his October challenge forwarded into BPD's supervisory Crime-Free Housing chain. The January 23, 2026 landlord contact followed that known course of criticism and petitioning. Plaintiff does not yet know whether Hoepfinger also accessed Request 26-119 before making that contact.

213. The private Defendants knew of Plaintiff's protected objections beginning in May 2025. DeCarlos Underwood had specific knowledge of Plaintiff's January records activity and renewed objection no later than February 9, 2026, when Plaintiff explained the requests and asked Under The Wood not to take adverse action based on renewed police pressure. On February 25, Under The Wood directly forwarded Plaintiff's February 9 protected objection and attached legal materials to Officer Hoepfinger, asked about the criminal court date, and stated that the matter had been turned over to counsel for eviction.

214. Plaintiff alleges on information and belief that Officer Donat knew of his protected activity through the shared Crime-Free Housing file, internal communications, the recent conversation referenced in her February 10 email, supervisory communications, or other City records. The precise source of her knowledge is within Defendants' control.

215. After Plaintiff's repeated protected complaints and petitions, and five days after his January 18 public-records request, Officer Hoepfinger renewed contact with Under The Wood concerning Plaintiff's address and continued association with the property.

216. Plaintiff does not allege that protected activity occurring after May 12, 2025 caused the original May 12 directive. This retaliation claim concerns the renewed enforcement beginning with Hoepfinger's January 23, 2026 contact and the actions that followed.

217. The renewed contact occurred after months without a documented request for a removal disposition and without a new incident, adverse adjudication, lease violation, or court order. It occurred five days after Request 26-119 and returned to the same directive Plaintiff had

repeatedly challenged, although Plaintiff does not yet know whether the request itself or the underlying traffic-stop record supplied the address information.

218. Officer Donat then participated in removal-related follow-up after both January requests, referenced a recent conversation, asked whether the leaseholder had been contacted, and requested a disposition from the landlord. On information and belief, her knowledge came through the shared Crime-Free Housing file, the recent conversation she referenced, supervisory communications, or related BPD records within Defendants' control.

219. After Plaintiff informed DeCarlos Underwood of the records requests and renewed his protected objection to the police pressure, the private Defendants exercised their own authority over the tenancy by refusing to pause enforcement, demanding exclusion, serving cure and termination notices, forwarding Plaintiff's protected objection and supporting materials to Officer Hoepfinger while announcing referral to eviction counsel, and filing an eviction action tied to the same BPD directive.

220. The adverse actions included renewed police monitoring and landlord contact, demands that Plaintiff leave or cease accessing his family home, an unauthorized-occupant designation, formal cure and termination notices, and an eviction lawsuit.

221. The causal connection is supported by the continuing course of protected criticism and petitioning; the months-long absence of documented removal follow-up; the January 23 contact five days after Request 26-119; Donat's February follow-up after both January requests; the officers' renewed focus on Plaintiff's address and removal; Plaintiff's February 11 crime tip and February 18 command-level follow-up before the February 23 termination notice; the absence of a new incident or adjudication; the reciprocal police-landlord reports of compliance and disposition; and Under The Wood's February 25 transmission of Plaintiff's protected objection to Hoepfinger together with its statement that eviction counsel had been engaged.

222. Plaintiff's protected activity was at least a motivating factor in the renewed police-landlord follow-up and adverse housing enforcement. The existence of the older allegation or police pressure does not exclude protected activity from also being a motivating factor.

223. At the time of the challenged conduct, it was clearly established that a public official could not subject a person to adverse action because he criticized police conduct, filed a police report or complaint, or petitioned government officials.

224. The challenged actions would deter a person of ordinary firmness from criticizing BPD, filing police reports or complaints, petitioning City officials, or using public-records procedures in support of efforts to investigate and challenge governmental conduct.

225. The private Defendants acted under color of state law for the conduct alleged in this Count because the City significantly encouraged or coerced the specified housing action and because they knowingly and willfully participated in the continuing police-directed process. After learning of Plaintiff's protected objections, they also exercised their own authority over the tenancy to continue the challenged adverse actions.

226. The retaliation alleged in this Count caused the injuries described above and violated Plaintiff's First Amendment rights.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and grant the following relief:

A. Compensatory damages presently estimated at $2,000,000, with the final amount to be determined by the jury, for Plaintiff's own injuries proximately caused by the federal violations proved in this action, including loss of secure tenant status, housing instability, emotional distress, reputational harm, out-of-pocket expenses, litigation burden, and any proven economic loss, subject to allocation by actionable conduct and the prohibition against duplicate compensation for the same injury in St. Clair County Case No. 2026AR000393;

B. Nominal damages for each constitutional violation to the extent compensatory damages are not established;

C. Punitive damages against each individual or private Defendant from whom punitive damages are legally available, but not against the City of Belleville;

D. A declaratory judgment under 28 U.S.C. Sections 2201 and 2202 that: (1) as applied to Plaintiff, the City's issuance, transmission, maintenance, and use of the mandatory permanent-removal directive without constitutionally adequate process violated the Fourteenth Amendment; (2) Defendants' renewed use of the Crime-Free Housing process to punish, deter, or burden Plaintiff's protected objections, complaints, petitions, police reports, and use of public-records procedures in support of those activities violated the First Amendment; (3) the private Defendants acted under color of state law to the extent established by their willful participation in the police-directed process; and (4) the challenged BPD "Eviction Notice" is not a judicial eviction order or judgment for possession and may not be treated as a continuing governmental command requiring Plaintiff's removal without new lawful process and constitutionally adequate safeguards;

E. Prospective injunctive relief requiring the City to cease using Crime-Free Housing notices or police communications that command, require, or pressure removal of tenants or occupants without lawful process and constitutionally adequate safeguards;

F. Prospective injunctive relief requiring the City to adopt appropriate training, supervision, legal review, tenant notice, neutral review, documentation, and correction procedures for Crime-Free Housing communications with landlords;

G. Prospective injunctive relief prohibiting the City and its officers from using Plaintiff's protected complaints, police reports, petitions, or information obtained from public-records procedures used in support of those activities as a basis for adverse housing enforcement;

H. Prospective relief requiring the City to withdraw, rescind, or clearly mark as inactive the challenged permanent-removal directive concerning Plaintiff and to notify Under The Wood that the directive is not a judgment or continuing command for Plaintiff's removal;

I. Reasonable costs and, if recoverable, attorney's fees under 42 U.S.C. Section 1988;

J. Prejudgment and post-judgment interest as allowed by law; and

K. Any other legal or equitable relief the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 5, 2026.

/s/ Martinez Staten
Martinez Staten, pro se
2911 Reiss Avenue, Belleville, Illinois 62226
MLStaten90@gmail.com | (618) 501-3938

## EXHIBIT INDEX

**Exhibit A:** May 12, 2025 BPD Eviction Notice concerning 2911 Reiss Avenue

**Exhibit B:** May 22, 2025 landlord email transmitting the BPD notice and reporting the required lease change

**Exhibit C:** Signed Crime-Free Housing Lease Addendum